# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

LISA VERONICA VARNADORE,             *
individually     and     as    *
Administratrix     of     the    *
Estate   of   Decedent   JOSHUA   *         NO. 2:17-CV-00013
MARSHALL FOSKEY or as next   *
of friend of JENNA GRAYCE   *
FOSKEY                      *
                            *
      Plaintiff,            *
                            *
      v.                     *
                            *
BRANDON     MERRITT,          *
individually,              *
                            *
      Defendant.           *

### ORDER

This Matter comes before the Court on Defendant Brandon Merritt's Motion for Summary Judgment. Dkt. No. 36. This Motion has been fully briefed and is ripe for review. This case involves the tragic death of Joshua Foskey. Mr. Foskey had locked himself in his vehicle and was sweating. His mother called to notify the authorities. She made a second phone call to report that Mr. Foskey stated he was not going to jail and that he wanted to die. Mr. Foskey drove away at a high rate of speed. After being briefly chased down by Deputy Brandon Merritt in his squad car, screeching to an abrupt stop on the shoulder of the road, swinging open his

door to jump out of his truck, refusing to show Deputy Merritt his hands, reaching back into his truck with both hands, and swinging his body around to face Deputy Merritt while lifting an object in his hand toward the Deputy, Mr. Foskey was shot and killed by Deputy Merritt. Mr. Foskey was later found to be unarmed, and the object he had retrieved appears to have been a CD case and papers.

Plaintiff argues that an officer is required to wait until a suspect plants his feet and takes aim before an officer can fire his weapon. The law does not support Plaintiff's argument. Based on the indisputable video evidence shown by the dashcam, an objectively reasonable officer in Deputy Merritt's shoes would have been justified in believing he was in danger of being shot by a deadly weapon. As such, despite the tragedy of this case, Deputy Merritt is protected from liability under the law, and for the following reasons, Deputy Merritt's Motion is **GRANTED**.

### Background Facts

The undisputed evidence shows that at around 9:00 a.m. on May 22, 2014, Lisa V. Varnadore called 911 requesting an ambulance, reporting that her son, Mr. Foskey, was asleep in his locked truck, that she could not wake him, and that he appeared to be sweating from his head. Dkt. No. 37, Ex. 10, "Initial 911 Call from Vicki Varnadore." In response, Deputy Merritt was dispatched to a residence at 59 West Georgia Avenue. Id. "Initial JDSO Dispatch." Deputy Merritt arrived in his vehicle at what turned out to be a

neighboring residence. Dkt. No. 37-2 ¶ 4. Meanwhile, the 911 dispatcher called Ms. Varnadore back, and she explained to the dispatcher that her son had woken up, that he had gotten out of his truck and staggered around "talking crazy," that a needle had fallen out of the truck, and that he had driven away in his Black Dodge Ram. Dkt. No. 37, Ex. 10, "2nd Call with Vicki Varnadore." She also explained that "he said 'I'm not going to jail. I want to die.'" Id.

To fill Deputy Merritt in, the dispatcher phoned him and reported that the caller said her son had driven toward Snipesville in a Black Dodge Ram and that he was "10-55," which means that he was under the influence. Id. "JDSO Dispatch #2"; Dkt. No. 37-2 ¶ 4. Nobody reported that Foskey was or might be armed. Dkt. No. 38 at 66. When Deputy Merritt arrived at the neighboring residence, he saw Foskey's truck spin out of the driveway. Dkt. No. 38 at 66. He told the same to the dispatcher and started his pursuit. Dkt. No. 37, Ex. 10, "JDSO Dispatch #2."

The dashcam video shows that Deputy Merritt entered the road at 9:14:21 a.m. Dkt. No. 37, Ex. 10 "Deputy Merritt, Front View Dashboard Camera" (Video 1) at ~0:40. Deputy Merritt activated his blue lights. Dkt. No. 38 at 36. He sped down the road, and Mr. Foskey's black truck came into view about 45 seconds later at 9:15:05. Id. at ~1:25. Deputy Merritt testified that he reached

AO 72A
(Rev. 8/82)

speeds in excess of 100 miles per hour attempting to catch up to Foskey's truck. Dkt. No. 37-2 ¶ 5. During this time, video shows that both Mr. Foskey and Deputy Merritt passed another driver in a red truck in the lane of oncoming traffic. Video 1 ~1:26. Foskey's truck twice veered into the oncoming lane. Id. at ~1:36, 1:42-47. Deputy Merritt told the 911 dispatcher that "he's all over the road; still can't get him to stop." Dkt. No. 37, Ex. 10, "JDSO Dispatch #3." At 9:15:29, Mr. Foskey's brake lights came on, and his truck veered off the road and came to an abrupt halt on the shoulder of the road. Id. at ~1:49-1:57. From the time that Deputy Merritt started down the road until Mr. Foskey's truck came to a complete stop, about a minute and thirteen seconds had elapsed.

As soon as he stopped the vehicle, Mr. Foskey swung open his driver side door and got out of his truck at 9:15:41. Video 1 at ~2:00. Deputy Merritt exited his vehicle immediately after at 9:15:43. "Deputy Merritt, Rear View Dashboard Camera" (Video 2) at ~1:58. As both parties agree, the dispatcher informed Deputy Merritt as he was exiting his vehicle that Ms. Varnadore had advised that Mr. Foskey "wanted to die." Dkt. No. 36-1, Defendant's Statement of Undisputed Material Facts at ¶ 15; Dkt. No. 45-1, Plaintiff's Response To Statement of Undisputed Material Facts at ¶ 15. Mr. Foskey then reached his hands back inside the

AO-72A
(Rev. 8/82)

truck for about ten seconds while looking at Deputy Merritt. Video 1 at ~2:04-15. Deputy Merritt testified that while Mr. Foskey's hands were inside his truck, he yelled at him to show his hands and that Mr. Foskey yelled back, "No!" Dkt. No. 37-2 ¶ 5. During this time, Deputy Merritt is behind the car door moving toward the rear of his own patrol car. Dkt. No. 38 at 36-38. Then, at 9:15:57, Mr. Foskey reaches further into the truck and opens the middle console. Video 1 at ~2:17. About three seconds later, he suddenly turns around, quickly swinging his hand up toward the direction of Deputy Merritt while holding, what was at that time, an unknown object. Id. at ~2:20. Believing Mr. Foskey had a gun, Deputy Merritt shot him, and Mr. Foskey fell to the ground. Id. at ~2:21-22; Dkt. No. 38 at 23.

It was later determined that the object in Mr. Foskey's hand was not a gun, but rather a CD case and some papers. Dkt. No. 37, Ex. 9, GBI Photos DSC_7058, DSC_7082, DSC_7084, DSC_7089, DSC_7088. The dashcam video shows the CD case and papers falling out of Foskey's hands after he was shot. Video 1 at ~2:20-23. Plaintiff has alleged that a video recording of the shooting (which no longer exists)[1] captured audio of Deputy Merritt asking Mr. Foskey for his license, registration, and insurance while cursing

---

1 Plaintiff argues that the spoliation of this video with audio evidence creates a presumption against Defendant. Dkt. No. 45 at 19; see infra Section II, Alleged Audio Argument.

AO 72A
(Rev. 8/82)

at him. Dkt. No. 45, Exs. 6-7. However, neither party presented such a video and the Court has not seen such a video. Additionally, GBI photos show that the papers that fell were in fact an invoice and receipt from Blue Flame LP Gas Co. Dkt. No. 37, Ex. 9, GBI Photos DSC_7082, DSC_7084.

In response to Mr. Foskey's death, his mother, Ms. Varnadore, brought this suit as the administratrix of Foskey's estate against Deputy Merritt, alleging excessive force in violation of the Fourth Amendment.

## Legal Standard

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The general rule is that in making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Johnson v. Booker T. Washington Broad. Serv., Inc.,

234 F.3d 501, 507 (11th Cir. 2000). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation omitted). The Supreme Court has further explained that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

When considering the record at summary judgment, "'the evidence of the nonmovant is to be believed, and all justifiable

AO 72A
(Rev. 8/82)

inferences are to be drawn in his favor.'" Shaw v. City of Selma,
884 F.3d 1093, 1098 (quoting Tolan v. Cotton, 134 S. Ct. 1861,
1863 (2014)). But, in cases with a video in evidence that
obviously contradicts the nonmovant's version of the facts, the
Court "'view[s] the facts in the light depicted by the videotape.'"
Shaw, 884 F.3d at 1098 (quoting Scott v. Harris, 550 U.S. 372,
380-81 (2007)).

In a use-of-force case, the facts must be taken in the light
most favorable to the plaintiff, but the determination of
reasonableness must be made from the perspective of the officer.
Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005). "At
summary judgment, we cannot simply accept the officer's subjective
version of events, but rather must reconstruct the event in the
light most favorable to the non-moving party and determine whether
the officer's use of force was excessive under those
circumstances." Stephens v. DeGiovanni, 852 F.3d 1298, 1315 (11th
Cir. 2017). "In order to overcome a summary judgment motion on
the basis of qualified immunity, the facts in dispute must raise
a genuine issue of fact material to the determination of . . .
whether police officers used excessive force." McCullough v.
Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009).

AO 72A
(Rev. 8/82)

## Discussion

### I.   § 1983 Claim and Qualified Immunity

In this case, Plaintiff brings claims against Deputy Merritt of excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 (2018).   A § 1983 claim requires the plaintiff to show that he was deprived of a federal right by a person acting under color of state law.   DeGiovanni, 852 F.3d at 1314.   In response to Plaintiff's § 1983 claim, Deputy Merritt has raised the defense of qualified immunity.

Qualified immunity grants "complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). The doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law." Id. (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002)).

For qualified immunity to apply, a defendant must show that he or she was a state actor engaged in a discretionary function within the scope of his or her authority at the time of the alleged violation. Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir.2012); Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000).   If the

AO 72A
(Rev. 8/82)

defendant meets this threshold issue, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity by satisfying a two-part inquiry. Terrell, 668 F.3d at 1250. First, the plaintiff must show that the defendant violated a constitutional right. Id. If such violation occurred, he must show that the right was clearly established at the time of the incident. Id. The Court has discretion to address either the constitutional violation prong or the clearly established prong first depending on the circumstances of a particular case. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

As an initial matter, no party disputes that Deputy Merritt was exercising discretionary authority, so the burden shifts to the Plaintiffs to show that qualified immunity does not apply. See Terrell, 668 F.3d at 1250. Based on the circumstances of this case, we turn first to the question of whether Deputy Merritt did in fact use excessive force in violation of the Fourth Amendment in shooting Mr. Foskey. The Court finds that he did not.

The Supreme Court has held that all claims of excessive force shall be examined under the Fourth Amendment and its reasonableness standard. Tennessee v. Garner, 471 U.S. 1, 7 (1985). The critical question for evaluating whether a particular application of force is excessive under the Fourth Amendment is whether it was objectively reasonable. Smith v. LePage, 834 F.3d 1285, 1294 (11th Cir. 2016). "The calculus of reasonableness must embody allowance

AO 72A
(Rev. 8/82)

for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989). "A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." Carr v. Tatangelo, 338 F.3d 1259, 1269 (11th Cir. 2003). "[T]he reasonable officer standard does not mean we give the challenged officer's self-serving testimony more weight," nor is reasonableness "based on [the officer's] subjective beliefs." Perez v. Suszczynski, 809 F.3d 1213, 1219-20 (11th Cir. 2016). "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." Long, 508 F.3d at 581. Deadly force is not excessive force where the officer has an objectively reasonable fear that the suspect poses an imminent threat of bodily harm. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246-47 (11th Cir. 2003) (per curiam). Thus, the Court is tasked with scrutinizing the totality of the circumstances, focusing on examining the level of force used in light of three main factors: (1) the severity of the crime, (2) the immediacy of the threat posed by the suspect to officers or others, and (3) whether the suspect sought to evade or resist arrest. Graham v. Connor, 490 U.S. 386, 396 (1989); see also Morton v. Kirkwood, 707 F.3d 1276,

AO 72A
(Rev. 8/82)

1281 (11th Cir. 2013) (reiterating the three Graham factors).  In doing so, the Court must "not view the use of force 'from the comfort and safety of our chambers' but rather 'through the eyes of the officer on the scene.'"  Small v. Glynn Cty., 77 F. Supp. 3d 1271, 1279-80 (S.D. Ga. 2014) (quoting Crosby v. Monroe Cnty., 394 F.3d 1328, 1333-34 (11th Cir.2004)), aff'd, McGehee v. Glynn Cty., Ga., 598 F. App'x 752 (11th Cir. 2015); see also Graham, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

## A. Severity of the Crime

The first factor the Court must analyze is the severity of the crime committed by Mr. Foskey.  Mr. Foskey was not charged with a crime, but we look to the possible criminal actions that Deputy Merritt was aware of when he responded to this incident. Deputy Merritt was called to the scene initially because Ms. Varnadore called 911 to report that Mr. Foskey was asleep in his locked truck, was sweating, and she could not wake him.  Dispatch subsequently informed Deputy Merritt that Mr. Foskey had driven off and was under the influence.  During the pursuit, Deputy Merritt observed Mr. Foskey driving erratically and, at one point, as shown in the video, even swerving completely into the oncoming lane.  Finally, Deputy Merritt stated that after turning on his

AO 72A
(Rev. 8/82)

blue lights in pursuit he was having some difficulty pulling him over. But, he did eventually stop, and the pursuit, in its entirety, only lasted about one minute and thirteen seconds.

Here, the facts show that the crimes being committed included possibly fleeing from police, doing so while under the influence, and violating traffic laws such as staying in the correct lane. See, e.g., O.C.G.A. §§ 40-6-395(a), (b)(5)(A)(iv). These crimes under Georgia law may or may not be a felony depending on the circumstances. For instance, if Mr. Foskey was placing "the general public at risk of receiving serious injuries" by fleeing police, it would be a felony; so would fleeing while under the influence. O.C.G.A. §§ 40-6-395(b)(5)(A)(iii)-(iv). But, none of these possible crimes on their own would put a reasonable officer on notice that Mr. Foskey "might be armed or violent." Davidson v. Opelika, 675 F. App'x 955, 958 (11th Cir. 2017) (holding that the first factor weighed squarely in the plaintiff's favor when the crime at issue was drunk driving and the drunk driver had even crashed into another vehicle). On the other hand, it is worth noting that a reasonable officer would likely assume based on the driving and information about Mr. Foskey being under the influence that he may act erratically when confronted. All told, this factor weighs in favor of Plaintiff.

## B. Immediacy of the Threat

The next factor is whether Mr. Foskey posed an immediate threat to the safety of the officer or others. The Eleventh Circuit has described this factor as a single question: "whether, given the circumstances, [the suspect] would have appeared to reasonable officers to have been gravely dangerous." Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010). Importantly, "even when the first and third factors are absent, the presence of the second factor . . . may justify entry of summary judgment for the officer on an excessive force claim." Shaw v. City of Selma, 241 F. Supp. 3d 1253, 1270 (S.D. Ala. 2017) (citing Davidson, 675 F. App'x at 958-60), aff'd, 884 F.3d 1093 (11th Cir. 2018). Finally, in deciding this factor, the Court notes that "'[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others,' use of deadly force does not violate the Constitution." Penley, 605 F.3d at 851 (quoting Garner, 471 U.S. at 11).

In this case, the circumstances leading up to the shooting demonstrate that Mr. Foskey would have appeared to a reasonable officer to be gravely dangerous. While in pursuit, Deputy Merritt was told by the dispatcher that Mr. Foskey was under the influence. Before pulling Mr. Foskey over, Deputy Merritt observed, and the video shows, that Mr. Foskey was driving erratically. Furthermore,

when Mr. Foskey eventually stopped, he did so by slamming on his breaks and quickly swerving onto the shoulder of the road. At this point, a reasonable officer would know that Mr. Foskey was, at the very least, not behaving normally and would be reasonably concerned by these three facts.

Almost immediately after stopping, Mr. Foskey opens his door and quickly steps out of his vehicle. At this point, any reasonable officer would become concerned. As Deputy Merritt noted in his deposition "[w]hen you swing your door open and jump out quickly, people don't normally do that." Dkt. No. 38 at 19.[2] The normal behavior is for a person to wait in the vehicle. Right after Mr. Foskey exited the vehicle, Deputy Merritt also exits his vehicle. The last thing that Dispatch told Deputy Merritt as he exited his vehicle was that Mr. Foskey said he wanted to die. Based on all of this information, a reasonable officer would be on notice that Mr. Foskey might be willing to harm himself, and in the process, someone else.

At this point, Deputy Merritt testified that he told Mr. Foskey to show Deputy Merritt his hands to which Mr. Foskey responded, "No." Dkt. No. 38 at 41. The video shows that Mr. Foskey did not

---

2 Plaintiff attempts to show that because Deputy Merritt normally asks people to step out of the car to perform a roadside test when he believes they are under the influence, he might have done that in this case. See Dkt. No. 38 at 10. However, this argument is without merit because the rear and front dashcam videos show that Mr. Foskey exited his vehicle before Deputy Merritt. Moreover, nothing in the record would indicate that high speed chases are the norm.

AO 72A
(Rev. 8/82)

show his hands, but rather, kept them in the truck for about ten seconds. Then he reaches even further in his truck, and as seen on the video and observed by Deputy Merritt, he opens the middle console.

Then, Mr. Foskey quickly swings his body around in one fast motion, out of the car, while bringing his right hand up toward Deputy Merritt. Mr. Foskey was clutching something that Deputy Merritt described as a "dark object." Dkt. No. 38 at 23. Deputy Merritt, believing that Mr. Foskey had a gun in his hand, fired a single shot that hit and killed Mr. Foskey. Although the object was later determined to be a CD case and a couple pieces of paper, a reasonable officer in light of all of the surrounding circumstances could reasonably conclude Mr. Foskey was raising a firearm toward Deputy Merritt. Carr v. Tatangelo, 338 F.3d 1259, 1269 (11th Cir. 2003) ("A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983."). The video shows how the motion of Mr. Foskey's hand swung up from the waist, across his body, and directly toward Deputy Merritt like someone raising a handgun about to fire. Given the surrounding circumstances, an objective officer would be more likely to conclude Mr. Foskey was drawing out a weapon rather than a CD.

AO 72A
(Rev. 8/82)

A reasonable officer in Deputy Merritt's position, knowing what he knew, would have had "probable cause to believe that" Mr. Foskey "pose[d] a threat of serious physical harm" to the officer, and as a result, the "use of deadly force [in this case] [did] not violate the Constitution." Penley, 605 F.3d at 851 (quoting Garner, 471 U.S. at 11). Based on the video evidence, the Court finds the second factor, on its own, dispositive in this case because there is no genuine dispute of material fact showing that a reasonable officer would not have had probable cause to believe Mr. Foskey posed a threat of serious physical harm.

## C. Whether the Decedent is Actively Resisting Arrest or Attempting to Elude the Officer by Flight

As for the third factor, Mr. Foskey was also actively resisting arrest. At least for some short amount of time, it appears that Mr. Foskey was fleeing Deputy Merritt before slamming on his breaks. Additionally, Mr. Foskey refused to comply with Deputy Merritt's order to show his hands. Instead, he continued to hide his hands from Deputy Merritt's view inside of the vehicle before ultimately reaching in further to open the center console. As explained above, these actions could give a reasonable officer probable cause to think that Mr. Foskey was retrieving a weapon. Although this is not a case where the decedent was still running from officers or engaged in a physical fight, Mr. Foskey's

AO 72A
(Rev. 8/82)

resistance to the order to show his hands in light of the other surrounding circumstances weighs in favor of Deputy Merritt with respect to whether his actions were reasonable.

### D. Plaintiff's Arguments

Plaintiff raises several arguments attempting to show that Deputy Merritt's actions were not objectively reasonable. Most of Plaintiff's arguments, if accepted, would require the Court to establish new case law of which Deputy Merritt would not have been aware. For example, a precedent may someday be set that officers must wait until a suspected shooter takes aim and plants his feet prior to an officer's use of deadly force. The Court is unaware of any United States Supreme Court, Eleventh Circuit, or Georgia Supreme Court decision that would require such astonishing practice and risk. To the contrary, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." Long, 508 F.3d at 581.

Additionally, Plaintiff attempts to distinguish this case from an unreported Eleventh Circuit case, Davidson v. Opelika, 675 F. App'x at 959, that granted summary judgment to the defendant officer on qualified immunity grounds. In Davidson, an officer was responding to reports of an erratic driver on the interstate who subsequently hit a tractor trailer and had pulled off to the

side of the road when the officer arrived. 675 F. App'x at 956-57. The Eleventh Circuit stated that neither the first nor the third factors weighed in the officer's favor because the driver was at most guilty of a DUI and had already stopped his vehicle when the officer arrived. However, as demonstrated in the video of that case (submitted to the Court along with Deputy Merritt's motion for summary judgment), the driver clumsily exited his vehicle and raised his hands toward the officer while holding a dark object later determined to be his wallet. The officer shot and killed the driver. But, under the second factor, the Eleventh Circuit found no excessive force explaining that:

> The positions of the object and Davidson's hands—established by the video—are key. To be clear, Davidson exiting his vehicle, reaching behind himself, and holding an unidentified object would not have been sufficient to make Hancock's use of deadly force reasonable under the circumstances. But the unusual position of the dark object in Davidson's outstretched and clasped hands would have led a reasonable officer to believe that Davidson was pointing a gun at him.

675 F. App'x 955, 959 (11th Cir. 2017).

The Davidson conclusion applies with even greater force in this case. Mr. Foskey's actions of hiding his hands from Deputy Merritt's view, opening the console, and quickly swinging his body around while lifting an object in his hand toward Deputy Merritt appear to be much more dangerous than the clumsily stumbling driver in Davidson holding out an unknown dark object later determined to be a wallet. Here, as in Davidson, the manner in which Mr. Foskey

held his object is also important in showing that a reasonable officer would believe that object to be a gun in this case.

Plaintiff relies on the statement by the Eleventh Circuit in Davidson that "[t]o be clear, Davidson exiting his vehicle, reaching behind himself, and holding an unidentified object would not have been sufficient to make Hancock's use of deadly force reasonable under the circumstances." 675 F. App'x at 959. Plaintiff believes that the facts here match the facts described by the Eleventh Circuit that "would not have been sufficient" to justify deadly force. Id. However, this case is different from those facts. Mr. Foskey did not merely hold an unidentified object. He hid his hands from Deputy Merritt's view, ignored his orders, and suddenly flung his hand up with the object being aimed toward the deputy. All of this was done in front of an officer who had just been told he is confronting a man who wants to die. In other words, the facts are materially different from the hypothetical in Davis, and they differ in a way that cuts decidedly against Plaintiff's argument.

Finally, Plaintiff alleges that Deputy Merritt was in no immediate threat from Mr. Foskey because he was always "completely behind something" and admitted that Mr. Foskey was so intoxicated that he could probably not walk a straight line. However, Deputy Merritt explained that someone "can come out and start pulling

AO 72A
(Rev. 8/82)

that trigger and you can get lucky. I mean you ain't got to aim." Dkt. No. 38 at 64. Again, we can look to the video to address this argument. To say that Deputy Merritt was completely shielded and protected because he was standing behind his patrol car would be incorrect. Deputy Merritt is approximately six feet tall, dkt. no. 38 at 40, and as such, neither the door nor the back of the patrol car could completely protect him from being shot. Indeed, to fire a shot at Mr. Foskey, at least part of Deputy Merritt's body must have been exposed. Furthermore, if the obviously inebriated driver in Davidson could be held to be an immediate threat despite his impaired state, so could Mr. Foskey in this case.

It is natural to engage in wishful hindsight whenever someone dies. However, that is not the proper standard. Here, the Court is bound to view these facts in the light most favorable to the Plaintiff, but, in doing so, it must also view them from the viewpoint of a reasonably objective officer in the position of Deputy Merritt. In light of the indisputable video evidence combined with the information relayed to Deputy Merritt from the dispatcher, the Court finds that there is no genuine dispute of material fact as to whether Deputy Merritt used excessive force in this case. He did not. As such, he did not violate Mr. Foskey's

AO 72A
(Rev. 8/82)

constitutional rights under the Fourth Amendment and is thus entitled to qualified immunity.[3]

## II. Alleged Audio Argument

Plaintiff raises arguments regarding alleged audio from Deputy Merritt's dash cam video that Plaintiff believes existed. In the briefs, Plaintiff made a spoliation argument, but at the hearing on this Motion, counsel for Plaintiff clarified that the audio argument was more about creating a genuine issue of material fact based on Robert Kirkland's testimony. Either way, the Court ultimately concludes that Plaintiff is not entitled to a spoliation charge and has not established a genuine dispute of material fact based on this argument.

Turning first to the spoliation issue, "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Griffin v. GMAC Commercial Fin., LLC, 2007 WL 521907, at *3 (N.D. Ga. 2007). A party asserting spoliation of evidence must prove that (1) the missing evidence existed at one time; (2) the opposing party had a duty to preserve it; and (3) the evidence was crucial to the case. In re Delta/AirTran Baggage Fee Antitrust Lit., 770 F. Supp. 2d 1299,

---

3 Because we find that there was no constitutional violation, we need not address the second prong of whether the right was clearly established. Davidson, 675 F. App'x at 959.

AO 72A
(Rev. 8/82)

1305 (N.D. Ga. 2011). "Even if all three elements are met, a party's failure to preserve evidence rises to the level of sanctionable spoliation only when the absence of that evidence is predicated on bad faith, such as where a party purposely loses or destroys relevant evidence." Id. (citations omitted) (internal quotation marks omitted).

Neither party has produced into evidence a video with audio of the shooting. Deputy Merritt's dashcam video introduced into evidence does not have audio. Deputy Merritt testified that this is because the audio feature had broken a few weeks prior to the shooting. Dkt No. 38 at 42. Plaintiff asserts that at one time, there was a video with audio. As proof, Plaintiff offers the deposition testimony of Monroe Hatton, Ms. Varnadore's brother-in-law. Ms. Varnadore had secretly recorded an unsworn conversation with Mr. Hatton; that recording was played to Mr. Hatton at his deposition. See Dkt. No. 45, Ex. 6. In the unsworn conversation, Hatton asserted that while watching a video of the shooting, he heard Deputy Merritt ask Mr. Foskey to show his license, registration, and insurance. Dkt. No. 45, Ex. 7 1:20-1:30; 2:25-2:58. However, Mr. Hatton testified under oath in his deposition that he had lied to his sister-in-law "[t]o get her to shut up about things that has happened," dkt. no. 40 at 11, and that he had not "watched a video of the shooting of Josh." Id. at 12. He stated repeatedly throughout his deposition that he had

never seen a video of the shooting.  See Dkt. No 40 at 16-17, 20-21, 23-24, 28, 31.

Plaintiff also points to the deposition testimony of Robert Kirkland, a self-employed computer consultant who had done some work for the sheriff's office.  Mr. Kirkland helped the sheriff's office and GBI retrieve a video of the incident from the server onto a readable disk.  In describing the process, he stated that "once we got the format where we could watch it and hear it, then we realized . . . this is going to work."  Dkt. No. 41 at 12.  When asked what he heard on the video, he stated "[j]ust the chase. You know, if I remember correctly, radio back and forth. A deputy saying how far away he was and things like that."  Id.  However, he also made clear that he was not sure which officer's car he helped extract a video from.  Id. at 18-19.  In a subsequently-filed affidavit, Mr. Kirkland explained under oath that after reviewing videos from both Deputy Merritt and Deputy Wooten's patrol cars from the GBI file, he could confirm that he had helped extract the video from Deputy Wooten's car and had only previously seen that video.  Dkt. No. 37-3.  Deputy Wooten's video did in fact have audio which included radio communications back and forth with Dispatch and Deputy Wooten giving his location.  See generally Dkt. No. 36, Ex. 3, "Deputy Wooten, Front View Dashboard Camera" (Video 3).  Mr. Kirkland stated that he had never seen the video from Deputy Merritt's car.  Dkt. No. 37-3.

Plaintiff has failed to prove spoliation because she has failed to prove that a video of the shooting containing audio existed, and even if such a video did exist, Plaintiff failed to present any evidence that Deputy Merritt acted in bad faith with relation to such a video. The only evidence that a video with audio of the shooting existed is a recorded statement made by Mr. Hatton that he then disavowed in a sworn deposition. As for Mr. Kirkland's deposition, his testimony also does not prove that such a video existed because his explanation in his affidavit is entirely consistent with what he said about being unsure which car he had retrieved a video from. While this evidence might be used to impeach a witness, it is not sufficient to meet the standard for spoliation.

Furthermore, this alleged audio evidence does not create a genuine dispute of material fact on the question of whether Deputy Merritt used excessive force in this case. First, as described above, the video evidence in this case is clear. The allegation of audio existing for the video does not change what can be seen in the video. Moreover, the allegation of audio is just that, an unproven allegation. Although the Court allowed Plaintiff time to develop this allegation, time and discovery confirmed that no audio exists, and anyone who said or thought that it did ever exist explained under oath their error. Perhaps, at most, Mr. Hatton

25

and Mr. Kirkland might be subject to impeachment. However, impeachment evidence cannot be used to create a genuine issue of material fact. See McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996).

### III. State Law Claims

Typically, when all of the federal claims in a case have been adjudicated, the Court will decline to exercise its supplemental jurisdiction and dismiss the remaining state law claims without prejudice. See Gray v. Royal, 181 F. Supp. 3d 1238, 1254 (S.D. Ga. 2016). However, when certain special circumstances exist, the Court will use its discretion to decide those remaining state law claims. This case is one of those special circumstances.

At the hearing on the summary judgment motion, Defendant's counsel requested that, in light of the long procedural history of this case, the Court decide the state law claims rather than dismissing the claims so that they can be refiled in state court. Motion's Hearing, August 16, 2018 at 10:26:25. Plaintiff's counsel agreed stating that "if you think the officer acted reasonably under federal law then I don't think you can say that the officer shot Mr. Foskey for no reason which would kill the Georgia claim.

And I don't think you'd be doing any of us a favor to send this to state court." Id. at 10:54:23.

"The Georgia constitution bestows official immunity on county government officers acting in a discretionary function and sued in their individual capacity unless they 'act with actual malice or with actual intent to cause injury in the performance of their official functions.'" Jones v. Fransen, 857 F.3d 843, 855–56 (11th Cir. 2017) (quoting Ga. Const. art. I, § 2, ¶ 9(d)). "Actual malice requires a deliberate intention to do wrong." Id. (citation omitted). Here, there is no dispute that Deputy Merritt was acting in a discretionary function during his confrontation with Mr. Foskey. Also, Plaintiff's counsel was correct in noting that in light of the fact that the Court found Deputy Merritt to have acted reasonably and the absence of any evidence in the record to the contrary, he did not act with actual malice in this case. Therefore, because both parties agree on these facts, Deputy Merritt is entitled to official immunity, and his motion for summary judgment with respect to the state law claims in this case is GRANTED.

## CONCLUSION

This case falls within the qualified immunity doctrine's very heart; for here Deputy Merritt was forced to make a split-second judgment in tense, uncertain, and rapidly evolving circumstances.

AO 72A
(Rev. 8/82)

Based on the undisputed circumstances, it was objectively reasonable for him to believe that he was in a shot or be shot situation. Defendant's Motion for Summary Judgment (Dkt. No. 36) is **GRANTED**.

　　**SO ORDERED**, this 30th day of September, 2018.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)